**ANHEUSER–BUSCH EMPLOYEES CREDIT UNION, et al., Plaintiffs,**

v.

**The FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

**No. 83–0335–CV–W–0.**

United States District Court, W.D. Missouri, W.D.

Dec. 1, 1986.

Laurence R. Tucker, Morris, Larson, King, Stamper & Bold, Leon G. Kusnetzky, Kansas City, Mo., for plaintiffs.

Kenneth E. Weinfurt, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSS T. ROBERTS, District Judge.

This action arises from the failure of the Oklahoma City, Oklahoma based Penn Square Bank, N.A. ("Penn Square"). The plaintiffs are six Missouri credit unions (Anheuser-Busch Employees Credit Union, Emerson Credit Union, St. Louis Federal Center Credit Union, Brentwood Credit Union, Monsanto Community Credit Union, and Gateway Credit Union), each of which had invested funds in excess of $100,000 in certificates of deposit issued by Penn Square.[1] On July 5, 1982, the Comptroller of the Currency closed Penn Square because of its insolvent condition.

Deposits in Penn Square were insured by the defendant, the Federal Deposit Insurance Corporation ("FDIC"). Although finding that a deposit insurance payout was in order, the FDIC also determined that, under its regulations, each of the plaintiffs was eligible for no more than a maximum of $100,000 coverage *per credit union*, and accordingly limited its payments in that fashion.[2] This suit resulted, plaintiffs contending that their status as credit unions placed them under one or more of the "multiple coverage" sections of the FDIC regulations, entitling them to insurance coverage at a maximum of $100,000 *per each of their individual members*. The case reaches me on defendant's motion for summary judgment.

Defendant urges that credit unions, as chartered in Missouri, are corporations and thus fall within the regulation set forth at

---

1. The amounts on deposit at Penn Square by the plaintiff credit unions, as of July 5, 1982, were as follows:

| | |
|---|---|
| Anheuser Busch Employees Credit Union | $2,000,000.00; |
| Monsanto Community Credit Union | $1,975,000.00; |
| Brentwood Credit Union | $ 900,000.00; |
| Gateway Credit Union | $ 523,005.86; |
| St. Louis Federal Center Credit Union | $ 500,000.00; |
| Emerson Credit Union | $ 230,000.00. |

2. In addition to the $100,000 insurance payment, each plaintiff received a receivership certificate for the uninsured portion of its deposit; said certificates represent claims against the as-

sets of the receivership. Apparently the receivership has made one partial distribution to plaintiffs, and anticipates that additional distributions will be forthcoming at a future date. The ultimate amount of the payments from the receivership, however, is not known at the present time. Thus, the amount in controversy involved in this litigation equals the total amount of plaintiffs' deposits at Penn Square Bank on July 5, 1982, plus interest, less the previously paid insured amount and the ultimate amount of the receivership dividends paid to each plaintiff.

12 C.F.R. § 330.5, providing (in effect) that corporations are insured only up to a maximum of $100,000 *per corporation,* notwithstanding the number of shareholders who may own stock in the corporation. In addition, defendant suggests, the relationship which exists between a credit union and its members is not, in any event, such that credit unions are entitled to "multiple coverage" under any of the applicable regulations. Finally, defendant contends that even if a relationship creating entitlement to "multiple coverage" did exist, there was no notification of it on Penn Square's books, as required by the regulations at 12 C.F.R. §§ 330.1(b)(1) and 330.1(b)(2).

Plaintiffs respond that although credit unions chartered in Missouri are corporations, the court should look beyond such technical characterizations and determine whether the members of a credit union are in essence the "beneficial owners" or "equitable owners" of the funds held and invested by that credit union. Plaintiffs further argue that, if such is the case, the notation on the Bank's books that the deposit was made by a "credit union" was itself sufficient notification to the Bank and the FDIC of a relationship which created entitlement to "multiple coverage." Related to all of this, plaintiffs also contend that the nature of the relationship between a credit union and its members is a question of fact, and that summary judgment is therefore inappropriate in any event.

After giving full consideration to the arguments of the parties, and for the reasons set forth below, I have determined that defendant's motion for summary judgment should be granted.

## I.

### PROPRIETY OF DISPOSITION ON SUMMARY JUDGMENT MOTION

It is true that in many instances the nature of a relationship between persons, be it agency, custodial, trust or otherwise, will turn on factual issues. In the present case, however, what plaintiffs actually seek is a determination that a particular legal (or regulatory) characterization will be given to certain facts which are themselves undisputed. I do not view such a controversy as one involving a "genuine issue as to ... material fact" within the meaning of Rule 56(c). *See generally, Northern v. McGraw-Edison Co.,* 542 F.2d 1336, 1343 (8th Cir.1976); *Bowers v. S–H–S Motor Sales Corp.,* 481 S.W.2d 584, 588–89 (Mo. Ct.App.1972); *Baker v. St. Paul Fire & Marine Insurance Co.,* 427 S.W.2d 281, 293 (Mo.Ct.App.1968) (all standing for the proposition that when the facts are not in dispute, a question of agency is one of law for the court; a proposition equally applicable, it seems to me, to trust, custodial and other fiduciary relationships).

There is no suggestion that the relationship at issue hinges upon the parties' intent, as such, or is based upon specific, individualized agreements between the credit unions and their members. Indeed, such a circumscribed approach would be self-defeating for plaintiffs, since it would destroy their argument that the existence of the necessary relationship may be ascertained, on the depository bank's records, from the mere fact that the depositor is shown as a "credit union." Plaintiffs' basic premise, rather, is that given certain general facts (undisputed by defendant) concerning the history of credit unions,[3] and their method of operation under the statutes which govern them, the necessary relationship is shown as a matter of law. If, beyond this, there are other *facts* at issue, plaintiffs have offered no hint as to their nature.

True, plaintiffs have alluded to the deposition testimony of their expert witnesses. However, a reading of those depositions

---

**3.** According to plaintiffs' witness Sandbothe, credit unions are the descendants of the German "Reifeisen Banks," organized as "cooperative financial organizations" by German farmers in the early 1800's in Flammersfield, Germany, when the farmers were unable to obtain consumer loans from banks. The concept made its way to Canada and then to the United States, with the first credit union being organized here in 1907.

discloses that, aside from the general facts referred to above, such testimony is confined to the expression of opinions concerning whether those facts demonstrate an agency, trust, custodial or other fiduciary relationship. That issue, of course, is for the court. The presence of those opinions does constitute a genuine issue as to a material "fact."

Finally, and perhaps of more ultimate importance, if the FDIC regulations are in fact designed to preclude multiple coverage for plaintiffs, despite the fact that their relationship with their members might involve certain agency or other fiduciary incidents, then even plaintiffs' basic premise on the point would fail. As developed in Parts III and IV hereof, I believe that such is indeed the case.

I conclude that the posture of the case is such as to make defendant's summary judgment motion an appropriate vehicle for resolution of the matters actually in dispute.

## II.

## NOTIFICATION

There are two regulatory subsections involved in defendant's notification argument. The first, set forth at 12 C.F.R. § 330.1(b)(1), reads as follows:

The deposit account records of the insured bank shall be conclusive as to the existence of any relationship pursuant to which the funds in the account are deposited and on which a claim for insurance coverage is founded. Examples would

be trustee, agent, custodian or executor. No claim for insurance based on such a relationship will be recognized in the absence of such disclosure.

The second, found in the immediately following subsection, 12 C.F.R. § 330.1(b)(2), provides:

If the deposit account records of an insured bank disclose the existence of a relationship which may provide a basis for additional insurance, the details of the relationship and the interests of other parties in the account must be ascertainable either from the records of the bank or the records of the depositor maintained in good faith and in the regular course of business.

■ As mentioned, plaintiffs' response to subsection (b)(1) is that if the relationship between a credit union and its members is, as a matter of controlling local law,[4] such that multiple coverage under the other regulatory sections would necessarily exist,[5] then the mere description of a depositor as a "credit union" would be adequate notice of that relationship. I find the argument acceptable, at least as a theoretical matter. Subsection (b)(1) does not call for any specific form of descriptive wording or language (although several "examples" are given, they are only that, and do not purport to be exclusive). If in fact, as a matter of controlling local law, the relationship between a credit union and its members is always and inevitably of the sort which the FDIC regulations contemplate as creating entitlement to multiple coverage, I see no good reason why the FDIC should not, in

4. According to the FDIC regulations, 12 C.F.R. § 330.1(a), the local law involved would be that of "the jurisdiction in which the insured bank's principal office is located"—here Oklahoma. In the present case, however, all parties rely upon and utilize Missouri law in connection with credit unions; a rather sensible approach since the organization, operation and functioning of plaintiffs—each chartered in the State of Missouri—is obviously controlled by Missouri law. In the circumstances, I take the parties' treatment of the point as an informal agreement that Missouri law will control.

5. In contrast to plaintiffs' apparent position, I do not read the regulations as having reduced

the entire question here to one of state law characterizations. Regulatory § 330.1(a) refers the reader to local law only "[i]nsofar as rules of local law enter into such determinations." Nor do the cases cited by plaintiffs in this regard support such a broad proposition. The point is that the FDIC has been granted the statutory authority to define and clarify the extent to which multiple coverage will exist, see 12 U.S.C. § 1813(m)(1), and where it has chosen to exercise that authority despite or without regard to state law characterizations, it may do so. As pointed out in the text, *infra,* I believe it has in fact done so in a connection which is critical to this case.

effect, be held to a knowledge of that state of affairs.

With respect to subsection (b)(2), defendant asserts that, according to the deposition testimony of representatives of each of the credit unions, the bookkeeping systems of those credit unions would not permit an identification of the individual members whose funds were actually used to purchase the CDs in question. I believe that argument overlooks § 330.101 of the regulations. Section 330.101 provides, in essence, that where funds are held in a custodial account, and where the custodian's records reflect the identity of each owner of the funds in that account, the "ascertainable interest" of such owners may properly be determined on a "fractional or percentage basis;" *viz*, an owner's interest in the deposited amount may be determined by applying to that deposited amount the same fractional or percentage interest that the owner's funds in the custody of the depositor bear to the entire amount of commingled custodial funds held by the depositor. Plaintiffs' claim here, of course, is that *all* of a credit union's members were the "owners" of the deposited funds. There is no suggestion that the identity of that membership could not be ascertained from the books and records of each credit union, or that the share balance of each of those members at any given point in time could not be so ascertained. Accordingly, at least if one assumes that a "custodial" or similar account was involved, the fact that it is impossible to trace each individual source of the funds which went to purchase the CDs is immaterial.

## III.

### THE FDIC'S "MULTIPLE COVERAGE" REGULATIONS

Both the applicable statutes and the FDIC's own regulations plainly suggest that, in some instances, a party other than the one making an insured deposit may be treated as the owner of that deposit. For example, 12 U.S.C. § 1813(m)(1) states that

in determining the amount due to any depositor there shall be added together all deposits in the bank maintained in the same capacity and the same right *for his benefit either in his own name or in the names of others....* (emphasis added)

Likewise, several sections of the FDIC regulations expressly or inferentially make allowance for such "other owner" treatment. *See* 12 C.F.R. § 330.1(b)(1) (referring to trust, agency, custodian and executorship situations), 12 C.F.R. § 330.1(c) (rules for valuing trust interests), 12 C.F.R. § 330.-2(b) (accounts held by agents or nominees), 12 C.F.R. § 330.2(c) (accounts held by guardians, custodians or conservators), 12 C.F.R. § 330.3 (testamentary accounts in the nature of "Totten trusts"), 12 C.F.R. § 330.4 (accounts held by executors or guardians) and 12 C.F.R. § 330.10 (trust accounts). In these instances, if there is more than one such "other owner" of the account, each will be entitled to the maximum insurance coverage of $100,000, thereby creating "multiple coverage".

The problem is in determining precisely when, and to what kinds of relationships, this "other owner" concept is to be extended. The regulations themselves apply it only to the specific (and by their terms, rather limited) examples mentioned, while excluding the interests of corporate shareholders where the corporation is engaged in an "independent activity," *see* 12 C.F.R. § 330.5, the interests of partners when the partnership is engaged in an "independent activity," *id.*, and the interests of the members of an unincorporated association where that association is engaged in an "independent activity," *see* 12 C.F.R. § 330.6.[6] Unfortunately, the regulations do not directly articulate any general, unifying theory behind these examples and exclusions. My immediate task, therefore, is to unearth the basic principles inherent in this regulatory scheme, and to ascertain from those principles the types of relation-

---

**6.** An "independent activity" is defined in 12 C.F.R. § 330.7 as an "activity other than one directed solely at increasing insurance coverage."

ships which will qualify for "multiple coverage."

Plaintiffs appear to suggest that any relationship which might be characterized as involving "beneficial ownership" or "equitable ownership," or as having other fiduciary incidents, will suffice. While there is a certain initial attractiveness to this approach, I cannot, in the final analysis, accept it as the appropriate test.[7] In some states, for example, it is said that shareholders of an ordinary business corporation are the "beneficial joint owners" or "equitable owners" of the corporation's assets, 11 Fletcher, *Cyclopedia Corporations* 100 (1986); 18 C.J.S. *Corporations* 1190–91 (1936), or have an "equity" in the corporate property which is affected by a "trust" for them, 11 Fletcher, *supra* 345, or that the corporation's directors and officers have a "fiduciary relationship to the corporation and its shareholders," *see Clark-Lami, Inc. v. Cord,* 440 S.W.2d 737, 740 (Mo.1969); *Ramacciotti v. Joe Simpkins, Inc.,* 427 S.W.2d 425, 431 (Mo.1968). So too, where partnership property is titled in the name of one partner, it is said that such person holds as a trustee for the benefit of the other partners, *see* 60 Am.Jur.2d *Partnership* 20 (1972); 68 C.J.S. *Partnership* 510 (1950), and more generally that the relationship between the members of a partnership is a fiduciary one, *Schroer v. Schroer,* 248 S.W.2d 617, 619 (Mo.1952), that each partner is an agent of the other partners, *Baker v. McCue-Moyle Development Co.,* 695 S.W.2d 906, 911 (Mo.Ct.App.1984), and that a managing partner occupies a position analogous to a trustee, *Bass v. Daetwyler,* 305 S.W.2d 339, 345 (Mo.Ct.App. 1957). The regulations, however, make clear—with no exceptions for differences in state law on these subjects—that individual "ownership" (and hence "multiple coverage") will *not* be recognized for the shareholders' interests in a corporation's deposited funds or for the partners' interests in a partnership's deposited funds, if such entities are engaged in an "independent activity." *See* 12 C.F.R. § 330.5. Plaintiffs' proposal would cut directly across these regulatory exclusions.

On the other hand, the mere fact that the depositor *is* a corporation or partnership does not automatically preclude a recognition of the ownership interests of others in funds deposited by the entity. Obviously, for example, a corporation could undertake to act in a formal agency, trust or other fiduciary capacity which would fall squarely within the regulations; a proposition even defendant does not dispute.

■ The only approach which both allows for an elimination of those relationships which the regulations exclude, and at the same time unifies those which the regulations recognize, is to hold that an *ownership interest* in a business entity which is accorded legal recognition in its own right—a corporation or, at least for some purposes, in some states, a partnership or an unincorporated association—will not qualify for recognition, no matter how that ownership interest (or the incidents thereof) may be defined by state law, while allowing recognition to those fiduciary relationships (regardless how labeled) which arise apart from and outside such an ownership context.[8] I find that this is in fact the intent of the regulations and conclude, accordingly, that the question in the instant case is whether a credit union member's

---

**7.** Contrary to plaintiffs' suggestions, the legislative history does not support the broad proposition that "beneficial ownership," no matter what the context, shall be the touchstone. Plaintiffs cite two statements of Judge L.E. Birdzell, then general counsel of the FDIC, made in 1935 in the course of his testimony concerning the Act. The first of these statements was made in regard to "individual ownership," in the context of a discussion concerning joint accounts and the separation thereof in order to obtain more coverage. *See Hearings Before the Committee on Banking and Currency, House of Representatives,* 74th Cong., 1st Sess. 26–7 (1935) (testimony of

L.E. Birdzell, General Counsel, Federal Deposit Insurance Corporation). The other comment by Judge Birdzell, *id.* 128, is closer to the point, but in fact is no more than a restatement of the language of 12 U.S.C. § 1813(m)(1). Nor do I believe the statutory language itself, *see* 12 U.S.C. § 1813(M)(1), mandates a test of such breadth. *See* discussion in the text, *infra.*

**8.** There are, of course, other potential exclusions based on other principles. There would, for example, be no multiple coverage where a bank uses ordinary deposited funds to make its own deposit in another, insured institution; not

interest in the funds deposited in Penn Square arose solely by way of an ownership interest in one of the plaintiff credit unions, and if not whether it arose by way of some fiduciary relationship outside that context.

Since plaintiffs have expressly declined to challenge the validity of the regulations, it is perhaps unnecessary that I determine whether this regulatory scheme is faithful to its statutory predicate. Out of an abundance of caution, however, I have reviewed the statutes in question and find nothing therein which would cause me to upset that approach. 12 U.S.C. § 1813(m)(1), quoted heretofore, comes the closest to touching the point, but it can hardly be taken as imposing a test that would, in effect, invalidate the regulations at 12 C.F.R. §§ 330.5 and 330.6. Given the FDIC's express statutory power to clarify and define the extent of the insurance coverage provided for under § 1813(m)(1), see § 1813(m)(1), together with the fact that providing the maximum insurance for *each* of the owners of all depositing corporations and partnerships would be to make the entire insuring program extraordinarily—if not prohibitively—expensive, I have no difficulty holding that the regulatory scheme the FDIC appears to have adopted is well within its legislative mandate.

## IV.

## THE RELATIONSHIP BETWEEN A MISSOURI CREDIT UNION AND ITS MEMBERS

Under Missouri law, it seems clear that the "members" of a credit union are, in the same sense as the "shareholders" of an ordinary business corporation, the "owners" of the entity. To become a credit union "member," assuming that the other membership requirements are met (generally, being within the "common bond" group—*e.g.*, a federal employee living in the required geographical area—and being approved for membership by the directors or a membership officer), one must purchase (or at least subscribe for) one or more shares in the credit union. *See* "Standard Bylaws of Missouri," 1982 revision, § 4.3(c), said by plaintiffs to have been in use by each of them; and *see generally* §§ 370.030, 370.070(1), R.S.Mo. (all subsequent statutory citations, unless otherwise identified, are to Missouri's Revised Statutes). Those shares—which are of a stated "par value" (like the shares of stock in many general business corporations), *see* § 370.020, and which may be transferred to others (with the limitation that the transferee be someone eligible for membership), *see* § 370.030(5); "Standard Bylaws of Missouri," 1982 revision, § 5.5— represent, like the shares of stock in any general business corporation, "the member's ownership interest in the credit union...." *See* § 370.080.3. Indeed, plaintiffs expressly acknowledge that their members' interests are ownership interests (Plt. brief, p. 14).

It is also clear, under Missouri law, that credit unions are legal entities recognized as such in their own right. They are, to begin with, corporations, *see* § 370.040.3,

---

because those original deposits represent an "ownership interest" in the first bank, but simply because the relationship between that bank and its ordinary depositors is a debtor/creditor relationship with those depositors retaining no ownership interest at all, as such, in the funds. *See American Bank of DeSoto v. People's Bank of DeSoto*, 255 S.W. 943, 945 (Mo.Ct.App.1923); and *see generally* 10 Am.Jur.2d *Banks and Banking* § 339 (1963); 9 C.J.S. *Banks and Banking* § 285 (1938). The same would be true of most deposits in a savings and loan association, *see Minnesota Trust Co. of Austin v. Hatch*, 368 N.W.2d 372, 377 (Minn.App.1985); *Galax Sav. & Loan Ass'n v. Goad*, 226 Va. 403, 309 S.E.2d 312, 314 (1983); *Mosley v. Hardin County Sav. &*

*Loan Ass'n*, 602 S.W.2d 82, 84 (Tex.Civ.App. 1980); *Wisconsin Bankers Ass'n v. Mutual Sav. & Loan Ass'n of Wisconsin*, 87 Wis.2d 470, 275 N.W.2d 130, 138 (App.1978); *Mengele v. Christiana Federal Sav. & Loan Ass'n of Wilmington*, 287 A.2d 395, 397 (Del.1972); *King v. Mortimer*, 37 Cal.2d 430, 233 P.2d 4, 9 (1951). And in fact that same theory could be applied to credit unions, since the Missouri statutes clearly recognize that ordinary deposits therein become the credit union's funds. *See* discussion in the text, *infra*. I believe, however, that the test outlined in the text above is a better way of resolving the question insofar as credit unions and the FDIC regulations are concerned.

and in fact are governed by Missouri's general corporation laws to the extent the same supplement and are not inconsistent with the provisions of the special chapter directed to credit unions (Chapter 370), *see* § 351.690. They have the power to make contracts and to sue and be sued in their own right, § 370.070(7), and have the power to "purchase, hold and dispose of property" (real or personal) in their own name, § 370.070(5). Further, and of particular significance, the Missouri statutes treat a credit union's funds, obviously including those derived in connection with the issuance of membership shares, *as those of the credit union itself,* just as with a general business corporation. Thus § 370.-070(3) grants a credit union the power to "deposit *its* funds and purchase certificates of deposit in state and national banks," (emphasis added), while § 370.070(4) grants a similar power to "invest *its* funds in securities...." (emphasis added). And *see also* § 370.075.

■ True, there are distinctions between a Missouri general business corporation and a Missouri credit union, both organizational and operational. Among other things, the precise steps to organization are somewhat different, although of the same general nature, *compare* §§ 370.010, 370.020, 370.030 and 370.040 with §§ 351.-050, 351.055 and 351.065; credit unions are, in contrast to general business corporations, statutorily "limited to groups of both large and small membership having a common bond of occupation or association or to groups residing within a well-defined neighborhood, community or rural district," *see* § 370.080(2); and a credit union's powers are considerably more restricted than those of a general business corporation, *compare* §§ 370.070, 370.071 and 370.075 to § 351.385, with a special priority mandated for loans by a credit union to its members, *see* § 370.070(4). However, while these differences reflect both the historical antecedents of credit unions and a continued recognition of their separate niche in the business world (a recognition also accorded to banks, savings and loan associations and other specialized corporate

forms), they are largely tangential to the present question, and certainly do not alter the central points noted above: that a credit union, under Missouri law, is a corporate entity legally recognized in its own right, and that a member's interest in it is an ownership interest—precisely the kind of situation I have determined the regulations intend to exclude in connection with "multiple coverage," no matter how that relationship or its incidents might be characterized for other purposes.

I also note that I am unable to find, as between a Missouri credit union and its members, in connection with the latters' membership interests (as such), any more of any sort of fiduciary relationship than exists between a general business corporation and its common shareholders. In both, after payment or deposit of the funds which create that ownership interest, those holding the ownership interest stand in the position of creditors whose claims to the entity's assets are subordinated to those of the entity's general creditors (both secured and unsecured), *compare* § 370.080.4 and § 351.470.3(2); and *see,* as to general business corporations, *New York Trust Co. v. Continental & Commercial Trust & Sav. Bank,* 26 F.2d 872, 875 (8th Cir.1926), *cert. denied,* 278 U.S. 644, 49 S.Ct. 80, 73 L.Ed. 558 (1926); *Simplex Paper Corporation v. Standard C. Box Co.,* 231 Mo.App. 764, 97 S.W.2d 862, 867–8 (1936). Both kinds of entities generally carry out their affairs through boards of directors elected by the owners (members in the case of credit unions, *see* §§ 370.180, 370.200; shareholders in the case of a general business corporation, *see* §§ 351.310, 351.315), and through officers chosen by those directors, *see* § 370.190; § 351.360. And, as previously noted, both kinds of entities hold their assets in their own name and right.

I acknowledge, again, that there are internal operational differences between a Missouri credit union and a general business corporation. Aside from those things already mentioned, the directors of a credit union must be members thereof, § 370.-030(2); credit union membership shares

may not be pledged as a security on any loan, § 370.080.3; the procedure for withdrawal of a credit union member and for redemption of his, her or its membership shares is rather unique, *see generally* § 370.085; a credit union member has but one vote at annual or special membership meetings, regardless of the number of shares held by that member, § 370.170.2; voting by proxy at annual or special membership meetings is prohibited, § 370.170.3; directors are not compensated, § 370.210.1; and dividends may, in addition to the ordinary method of payment, be paid by way of interest refunds on loans to members, § 370.300.3. There are other distinctions as well. All these things, however, are *for the present purpose* matters of form, not substance: they reflect—again—the historical antecedents of credit unions as well as their separate niche in the financial community (in the same sense that banks and savings and loan associations occupy separate niches), but they do not reflect (or create) any general legal relationship between a credit union and its members which is different from that of a general business corporation and its common shareholders. Missouri credit unions and general business corporations may represent separate sub-species of the same kind of business organization, but they share the characteristics which are critical here. In point of fact, a Missouri credit union is nothing more than a specialized form of corporation.

Finally, I note that plaintiffs do not claim any sort of fiduciary relationship with their members which arose independently from or outside the context of the latters' ownership interests as members,[9] and that each plaintiff was obviously engaged in an "independent activity" within the meaning of

12 C.F.R. §§ 330.5 and 330.7 (an "activity other than one directed solely at increasing insurance coverage," *see* § 330.7). That being so, and given the other points previously made, I believe that defendant's motion must be granted.

## V.

## ORDERS

It is, accordingly,

ORDERED that defendant's motion for summary judgment should be, and the same is hereby, granted; and it is further

ORDERED that defendant shall have its taxable costs herein incurred and expended.

---

9. In Count II of their complaint, plaintiffs allege that the funds they deposited in Penn Square were "IRA funds." However, testimony from representatives from each of the credit unions (or supplementary documentation), reveals that in fact none of the plaintiffs served as an IRA trustee with respect to any funds deposited in Penn Square. Given this, and the fact that plaintiffs have offered no contrary proof, or even any argument on the matter, I assume the

claim has been abandoned; and even if it has not been these circumstances would compel a summary judgment in defendant's favor on the point. Furthermore, even if all this were not so, I would still be forced to reject the claim, since this sort of account would hardly be one which is revealed, on the depository bank's records, by the mere designation that the depositor is a "credit union."