**Morris BOWERS and Pearl Bowers, Respondents,**

**v.**

**S–H–S MOTOR SALES CORPORATION, a corporation d/b/a Midwest Motors, Appellant.**

**No. 25575.**

Missouri Court of Appeals, Kansas City District.

April 3, 1972.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 11, 1972.

Application to Transfer Denied July 17, 1972.

Billy S. Sparks, Harold T. Van Dyke, Kansas City (Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, of counsel), for appellant.

Clifford N. Jarrett & Bruce G. Heavner, Kansas City (Heavner, Jarrett & Kimball, Kansas City, of counsel), for respondents.

PER CURIAM:

Plaintiffs recovered a judgment against defendant for $225.00 actual and $10,000.00 punitive (After trial court remittitur of $700.00) damages on account of false representations of defendant in the sale of an automobile. The issues presented are (1) that the court erred in not directing a verdict for defendant because "Plaintiffs' evidence shows conclusively that the plaintiffs did not sustain any damages;" (2) Instruction No. 3 was erroneously given because of lack of evidence to direct a verdict therein; that it did not require a finding of agency as required by MAI 18.01, or that plaintiffs had the right to rely on the alleged representation by failing to include the words of MAI 23.05 "in so relying plaintiff was using ordinary care"; and (3) the amount of the verdict, particularly punitive damages, was based upon bias and prejudice and was the result of the failure of the court to admit relevant material and competent evidence of defendant, and a remittitur is requested because of contended excessive damages.

In October, 1965, Morris Bowers decided to buy a car. He saw Midwest Motors advertisement on television, and his son, Dean, learned that Midwest had the car he wanted. Morris and Dean went to Midwest on the same day, arriving about 5:00 or 6:00 in the evening. A salesman, Harper, met them and Morris told him he was looking for a four-door Dodge, automatic, radio, heater, and with power steering. Harper showed him a lot of 1966 new cars but they were not equipped like the car Morris wanted. Harper then said they had about seventy-five 1965 models that had not been sold, and if Morris was interested in one they could sell him one cheaper, and "Well, he said they were all new cars." Morris then went with Harper across the street and to the west and there showed him the 1965 models, and found one which was equipped as Morris wanted. It appeared to be a new car, and Morris did not examine the tires "because on a new car that is not necessary." "Q. Then at that time were you told it was a new car? A. Oh, yes. We didn't talk about anything only a new car. Used cars was never mentioned." Morris' son drove the car away after he bought it, and his son happened to look at the speedometer and noticed it had 500 miles on it. The son called Harper's attention to it and Harper said, "[W]ell, they just drove it around from one lot to another and to show, such as that, and said it had never been used as

a demonstrator." Morris believed Harper when he told him this. On October 29, 1965, Morris gave Midwest his check for $2,400.00. He received a receipt and was told that he would get the rest of the papers (title and license) in the mail.

Morris then, on Friday, drove the car to his home in Hamilton, Missouri. On Sunday he looked the car over and found lube stickers on it and noticed that the spare tire had gravel in its tread, and that it had a puncture plug in it which was sticking out about two inches—it had not been cut off. He then noticed that the tires had dips in them, "They were at least half wore out." One of the two lube stickers said 4,500 miles and a date which Morris could not remember. Morris stopped payment on his $2,400.00 check on Monday.

On the following Tuesday Morris returned to Kansas City, drove to Midwest Motors, got out of the Dodge car and left his wife sitting there in it. He went inside and saw Harper and told him the car had a lot of miles on it and that he was going to expect them to do something about it, "and he said it just couldn't have (happened) at all and so he took me into Mr. Brown and Mr. Brown couldn't believe it at all and I took him out and showed him the tires." Mr. Brown told Morris, "He said it just couldn't have any miles on it, but he looked at them tires and he said anybody can see them tires have been drove a lot of miles, but he couldn't figure out how it happened and he finally said that they had a whole lot—they had eighty-five men working there and he said somebody has switched them tires and he said they have quite a lot of trouble about that, and things like that. And he said that is what happened, somebody has switched them tires."

Brown said he would put on a new set of tires, which was done, and he told Morris he did not know how the stickers got on the car unless they got their service sticker on the wrong car. Brown showed him the motor of the car and it was nice and clean as one could be, and Brown asked Morris and his wife if they thought a motor that could look like that could be a used one, "one that had been drove a lot." "Q. And did he at that time tell you that it hadn't been driven? A. Oh, yes, he said it couldn't have been drove", and Morris finally believed him.

Some new papers, another bill of sale, were drawn up and Brown gave them back $50.00 for their trouble, "He did say he wanted to make it right and make us feel good." and Morris gave him another check for $2,350.00 which cleared his bank. "Q. (By Mr. Jarrett) Mr. Bowers, I notice that on this exhibit the words 'Demo sold with mileage' and with an 'X' out there, and where you signed it. * * * A. Well, it's on there and all that, but I think it slipped by me when I signed it. I didn't look at it too close. Q. There wasn't anything said about it? A. No."

A letter postmarked November 2 was received by Morris from Midwest Motors which enclosed a factory certicard, and which stated, "Your recent purchase of a new Dodge from Midwest Motors was greatly appreciated and I wish to thank you personally. I trust that by now you're enjoying the many features of your automobile and the benefits of owning a new Dodge. * * * May I take this opportunity of welcoming you both as a new Dodge owner and also as a respected and valid Midwest Dodge customer. (signed) Harry Schwartz, President, Midwest Motors, Inc." Another like letter was received by Morris on November 23.

Morris got to wondering whether he had purchased a new car when he got his "deed". He took the papers Midwest sent him and tried to get a license plate in Hamilton but "They wouldn't sell them to me because the deed hadn't been signed right." He came back to Kansas City and saw Mr. Brown, who had the secretary sign it. Morris "got to looking at that deed and it said on there a title number and the previous title number and I began

to wonder then about that previous title number." He asked Mr. Brown about it and he told him that it didn't mean a thing. "He said they sold a lot of cars there and every once in a while they lost a deed and they would have to send in and get another one." Morris did not believe him, so his son sent the numbers in to Jefferson City to have them checked. This led to a confrontation with Mr. Brown and Morris then told him he had sold him a second-hand car instead of a new one, which Brown first denied but finally said the school district did have it but did not really own it. On cross-examination of Morris it was developed that the car had two lube stickers on it, "Q. At the time you were down at Midwest the second time, at that time you had discovered I believe you told us two lube stickers on that car. A. That's right. Q. That indicated, as I recall you said it had over 9400 miles? A. The other was 9400 and the other was forty five." As to the buyer's order, signed by Morris in two places, one place at the top said it had mileage on it—Morris knew it had 500, and it was not supposed to have more.

Clarence Rippeto, of the Motor Vehicle Registration Office in Jefferson City, established that the School District of Kansas City, East High School, applied for a certificate of title on a 1965 Dodge Coronet, Identification No. W–357 141761, on December 17, 1964. The title was issued December 30, 1964, and was assigned in July, 1965. Another certificate of title was issued to Midwest Motors August 4, 1965, and was assigned to Morris and Pearl Bowers in November, 1965. A new certificate of title was issued to the Bowers on December 30, 1965. Rippeto testified further that it is not necessary for a dealer to title a new car in its own name.

Benson Harper checked the tires on the 1965 Dodge for Morris. He found 6/32nds tread depth, 11/32nds being the usual tread depth on original equipment which are possibly good for 20,000 miles. He did compare the mileage on the door (lube) stickers with the tread measurements of the tires, and they seemed to be compatible.

Guy N. Burton was vice principal of the Kansas City School system. For driver education purposes he received a Dodge Coronet in the fall of 1964. In June, at the end of the school year, he turned the car in to Midwest Dodge. He figured the car had mileage on it in the neighborhood of 3,000 miles, he having used it about 5½ months. It would not be unreasonable for a driver education car used for that length of time to have 9,400 to 10,000 miles on it.

The testimony of Dean R. Bowers was corroborative of that given by his father, Morris.

William H. Heavener, a car dealer and salesman for 24 years, valued a car such as Morris' at about $2,750.00 if not titled. If it were titled, the difference in evaluation would be $400.00 to $500.00, and it would affect its market value if it had been used as a driver ed car, as compared to a demonstrator, $400.00 to $500.00. R. Findley Mason, also a car dealer and salesman, gave the value of the car with 500 miles on it at $2,300.00 to $2,500.00, with $200.00 to $300.00 difference between a titled and nontitled car. A driver training car would be worth less than one used as a demonstrator, and the depreciation on a 10,000 miles car would be ⅛th of the selling price.

Carl A. Harper testified that he had been employed as a salesman for Midwest Motors for 9 years, and that he sold a car to Morris in 1965. He denied describing it as a new car—he sold it as a demonstrator with miles—there was no representation as to the miles on it. With respect to Morris' conversation with Mr. Brown, Harper described that person as the general manager of Midwest Motors, and was present when he (Brown) told Morris that the tires did not belong on the car and that they apparently got switched.

■ A reading of the testimony of Heavener and Mason shows that the jury

reasonably could have found that plaintiffs were damaged by reason of the representations made in an amount at least equal to the $250.00 actual damages given. Defendant omits to mention that the value of the car would be less, according to these witnesses, if it had been used as a driver education car, which testimony, if believed, would reduce what plaintiffs paid for it from $400.00 to $500.00. The proof is in accordance with the measure of damages in cases such as this stated in Shechter v. Brewer, Mo.App., 344 S.W.2d 784, 789, as being the " 'benefit of the bargain' rule—the difference between (1) the actual value of the property at the time it was purchased and (2) what its value would have been if defendant's representations had been true." See also Auffenberg v. Hafley, Mo.App., 457 S.W.2d 929, 937 [24–27], a case involving alleged misrepresentation that an automobile sold was a new one. There is no merit in defendant's first contention.

■ Instruction No. 3, given by the court, is:

"Your verdict must be for plaintiffs if you believe:

"First, defendant represented that the motor car had been driven approximately 500 miles, intending that plaintiffs rely upon such representation in purchasing the motor car, and

"Second, the representation was false, and

"Third, defendant knew that it was false, and

"Fourth, the representation was material to the purchase by plaintiffs of the motor car, and

"Fifth, plaintiffs relied on the representation in making the purchase, and

"Sixth, as a direct result of such representation, the plaintiffs were damaged."

"M.A.I. 23.05

"Submitted by Plaintiffs"

Defendant says there was no evidence sufficient to support this verdict directing instruction. It says that the case was submitted on the *second* sale of the car, at which time the plaintiffs had knowledge that the tires had some 9,500 miles on them, and that the car had been lubricated at 4,500 and 9,400 miles. It seems to argue that since there was a second sale, the submission that "defendant represented the motor car had been driven approximately 500 miles, is not supported because Mr. Brown made no such representation under the evidence, and there was no evidence of his agency." It is apparent that plaintiffs' evidence showed a chain of circumstances which were sufficient to show the agency. Morris dealt with Harper and Brown, and their acts were confirmed by Harry Schwartz in sending the letters reciting that Morris had bought a new car. Who else other than a salesman-agent would a prospective automobile purchaser such as Morris contact upon entering defendant's place of business? The facts are established in this record that both Harper and Brown participated in duping Morris. Brown pointed out the clean motor and asked them whether a motor that looked like that would be a used one, and "he said it couldn't have been drove."

Defendant says Instruction 3 is erroneous because it failed to submit to the jury the fact of agency as set forth in MAI 18.01. The applicable general rule is stated in 3 Am.Jur.2d Agency, Sec. 359, p. 717, "In determining the existence or the nonexistence of an agency in any particular instance, the firmly established general rule is that when the facts relied upon to establish its existence are undisputed, and conflicting inferences cannot be drawn from such facts, the question of the existence of the agency is one of law for the court." In Seehorn et al. v. Hall et al., 130 Mo. 257, 32 S.W. 643, the court refused an instruction offered by defendants on the subject of their agency. Plaintiffs' instruction did not include that issue.

The court said, "Whether an agency exists, under an ascertained state of facts, is a question of law, to be determined by the court," and went on to remark that if the evidence was conflicting, the jury would only have to find what the evidence established in that effect, and that defendant's instruction did not inform the jury as to what facts would constitute an agency. In Ford v. Stevens Motor Car Co., 203 Mo.App. 669, 220 S.W. 980, it was held not error to refuse to instruct as to the authority of defendant's agent where there was no question as to such authority, and defendant confirmed and adopted the agent's acts (as defendant did here by Schwartz' letters to plaintiffs). The recent case of Baker v. St. Paul Fire & Marine Insurance Company, Mo.App., 427 S.W.2d 281, 293 [15], further enunciated the foregoing general rule, and said further (loc. cit. 427 S.W.2d 293 [14]), "Defendant insists that the submission [of agency] was mandatory under terms of MAI 18.01 which contains prescribed forms for submitting the issue of agency 'where defendant master or principal is being sued *and he has denied agency of the alleged servant or agent.*' (Our emphasis.) We do not interpret the foregoing as requiring the submission of agency to the jury merely because the existence of that relationship has been denied by pleaded allegation or by oral disclaimer when it is unaccompanied by any supporting facts to substantiate the denial." There is simply no controverted issue of agency in this case; there is no fair difference of opinion as to the existence of the agency; it is apparent under the facts of this case, that the submission of that fact would not have produced a different result; and consequently the court did not err in not including that matter in the instruction.

Instruction No. 3 is erroneous, says defendant, because it failed to submit to the jury for a finding that plaintiffs had the right to rely upon the alleged representation, by the use of the words in MAI 23.05, "in so relying, plaintiff was using ordinary care." No such submission was required here on these facts: Positive statements about the car were made by both Harper and Brown. Morris was first deluded as to the miles on the car being only 500 by Harper's assurance that the same were accumulated in driving it from lot to lot for the purpose of showing it. He was next deluded as to the condition of the tires (they had been switched by an employee) and the lubrication stickers on the door being put on the wrong car. He was repeatedly assured that the car "hadn't been drove," and this was emphasized by showing him the clean motor. The true history of the car was not readily available to Morris. In the face of the positive assertions that it had not been driven, and the further cover-up statements about the tires and service stickers, there was no fact that would put Morris on inquiry. The parties were in unequal positions as to the facts, which were particularly within the knowledge of Harper, Brown and the defendant. This was the theory of plaintiffs' case, which is governed by Meyer v. Brown, Mo.App., 312 S.W.2d 158, 161. In that case the verdict directing instruction was attacked solely because it did not require the jury to find that plaintiff "had the right to rely upon" the alleged misrepresentation. The court rejected the contention (loc. cit. 312 S.W.2d 163 [7]) because a credibility of witness instruction was given, and defendant's Instruction A was given which required the specific finding of a right to rely. The there quoted fraud case of Monsanto Chemical Works v. American Zinc, Lead & Smelting Co., Mo., 253 S.W. 1006, controls here: "If there were facts which the defendant thought justified a more specific direction as to plaintiff's duty to use diligence before trusting defendant, defendant should have asked such an instruction. Nondirection in that respect was not error." Plaintiffs' Instruction No. 3 fairly submitted their theory of recovery for fraud, encompassing the above related facts showing reliance on representations made, under circumstances

inducing them not to make inquiry, and not revealing anything to show a lack of ordinary care in the face of the positive representations made. Limited to the facts of this case, there was no necessity to submit the words of MAI 23.05 "in so relying, plaintiff was using ordinary care." For further cases restricting the duty to use diligence in these circumstances, see Shechter v. Brewer, Mo.App., 344 S.W.2d 784; importantly, Beshears v. S-H-S Motor Sales Corporation, Mo.App., 433 S.W.2d 66, 72 [6, 7]; and Barylski v. Andrews, Mo.App., 439 S.W.2d 536, 541 [8, 9].

■■ Under the facts here of not only an initial representation that the Dodge car was a new one with only 500 miles on it, but of further representations that the later discovered worn tire conditions and lubrication stickers were the result of a switch, and getting the stickers on the wrong car, the jury could readily find that defendant's conduct was flagrantly deceitful and reprehensible. It intentionally made the sale of the car knowing that it had been previously titled and used as a driver's education car, concealing these facts, amounting to fraud, from plaintiffs. The amount of punitive damages, awarded for the purpose of inflicting punishment for wrongdoing and as an example and deterrent to similar conduct, lies wholly within the sound discretion of the jury, and will not be interfered with unless there is an abuse of discretion. Here the trial court, in the exercise of its discretion (although that is reviewable), significantly did not reduce the punitive damage award below $10,000.00. "Ordinarily, abuse of discretion in this reference means so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of

judgment." And while "generally, punitive damages must bear some relation to the injury inflicted and the cause thereof", the jury should take into consideration the attendant circumstances. (Quotes from Beggs v. Universal C.I.T. Credit Corporation, Mo., 409 S.W.2d 719.) That is what the jury has done here under the evidence of defendant's injurious and wrongful acts, resulting in the mulcting of plaintiffs, all so strongly established in this record. For the purposes of penalty and deterrence, the jury must have taken into account the degree of malice and contumely of the acts. The size of the punitive damage verdict, under all the facts and circumstances, is not so disproportionate to the amount of actual damages suffered as to indicate an abuse of discretion on the jury's part. As distinguished from the Beggs case (where officials of defendant did not directly participate in the agent's wrongful acts) here, as the jury could find, the participants in the fraud were Harper, Brown and Schwartz, president of defendant Company. An award of punitive damages need not be reduced solely because no other award has reached the same figure; something else must be demonstrated as a basis for finding an abuse of discretion in failing to require a remittitur. Defendant's requested remittitur is denied. The mere size of the verdict does not show bias and prejudice. There is nothing in this case indicating that the jury was actuated by improper motives or that there was a clear absence of honest judgment, or that the verdicts resulted from any misconduct engendered during the course of the trial. Bower v. Hog Builders, Inc., Mo., 461 S. W.2d 784; Garvis v. K Mart Discount Store, Mo.App., 461 S.W.2d 317.

The judgment is affirmed.