**SAB HARMON INDUSTRIES, INC.,**
**Respondent-Appellant,**

v.

**ALL STATE BUILDING SYSTEMS,**
**INC., Appellant-Respondent.**

No. WD 38003.

Missouri Court of Appeals,
Western District.

June 30, 1987.

William C. Paxton, Paxton, Kerber, Halas, Jeffries & Mencl, (Originally John R. Mencl), Independence, for appellant-respondent.

Robert J. Bjerg, Linde Thomson Fairchild, Langworthy Kohn & Van Dyke, Kansas City, for respondent-appellant.

Before SHANGLER, P.J., and MANFORD and BERREY, JJ.

SHANGLER, Presiding Judge.

The plaintiff SAB Harmon Industries, Inc. sued the defendants Phenix Ventures, Limited and All State Building Systems, Inc. for breach of contract. Harmon dismissed the cause of action against Phenix Ventures at the conclusion of the evidence, submitted against All State Systems, and had the verdict of the jury for $291,785.16. All State Systems appealed

from the judgment entered on the verdict and Harmon cross-appealed.[1]

SAB Harmon Industries, Inc. manufactures electronic control devices. Harmon maintained several plants, among them the site at Grain Valley. Phenix Ventures, Limited was the manufacturer of the Phenix I Dish Manager, an electronic satellite control unit. The plant of that corporation was in Kimberling City. Phenix manufactured only for wholesale. All State Building Systems, Inc. was the distributor of products, through a network of dealers, the Phenix I Dish Manager among them.

In August of 1983, one Gary Robinson, a contract engineer, made overture to Harmon regarding the production of an electronic control device. This device was a component of a complete system already in production. Robinson met with Schmitz, a Harmon representative, and with Aldrich, Harmon production manager. That initial meeting was in the nature of a site survey to determine the production capability of Harmon to manufacture the device. Aldrich inquired as to the identity of the company Robinson represented, but he was not at liberty to make that disclosure, and the company remained anonymous.

The next discussion as to the feasibility of production by Harmon of the electronic control device was conducted on September 20, 1983 at Grain Valley plant site. Harmon production manager Aldrich was again present as were commission man Schmitz and contract engineer Robinson. Two others were also in attendance: James McGuire and Charles Noel. Aldrich recounted that they told him they were in several types of businesses, but neither would identify the company either represented on the venture presented to Harmon, nor the nature of that business, nor the position either held with that—or any other company. James McGuire displayed a business card, but only his name appeared on it. The purpose of the September 20, 1983 meeting, as Aldrich explained, was that "[t]hey were looking for some company to produce this Phenix device for them, this dish rotating management device." The device itself was designed to fit atop a home television set serviced by an outdoor satellite dish, and functioned to change the position of the dish from one satellite to another by a press of the electronic button. They had heard of the electronic products made by Harmon and wanted a "quote on 10,000 units" on the basis of a predesigned prototype. They informed Aldrich that a "lot of material" had already been purchased so they asked for two quotations, one for labor only and the other for both labor and materials. They were eager for the production of units and wanted a quote within a few days. After consultation with Randy John, his superior, and others at the Harmon plant, Aldrich made a tender of price, based on the production of 10,000 units, of $24 per unit for labor only and $105.29 per unit for labor and materials. It was the Aldrich testimony that up to that time, he had never heard of either All State Building Systems, Inc. or Phenix Industries, Limited. Some time later he was furnished a brochure, but as of September 20, 1983 he still did not know "who we'd be doing business with."

McGuire confirmed that the purpose of the September 20, 1983 meeting with the Harmon representatives was to find a manufacturer for the satellite dish manager. It was his testimony that he presented himself to Aldrich as a representative of Phenix and not of All State. In the course of discussion he informed Aldrich that he was the sole owner of the Phenix shares—that it was his corporation. McGuire was then also manager of the All State Building Systems, but [he said] made no representation on behalf of All State to Aldrich at that meeting.[2] It happened that Noel, who accompanied McGuire to the meeting, was

---

1. It was the Harmon evidence that the breach entailed damages in the sum of $382,322.96. Whatever aggrievement Harmon meant to present by the cross-appeal was not perfected by a brief, and hence is deemed abandoned. Rules 84.04(j), 84.05(a) and 84.08.

2. McGuire attended the trial as authorized representative of the defendant All State in his role as manager of that corporation. He was called to testify by the plaintiff Harmon and was examined as a hostile witness.

then a dual employee of both the Phenix and the All State Systems corporations. Noel, however [according to McGuire], never undertook to speak on behalf of All State in any capacity at the meeting.

McGuire and Noel did project to Aldrich the sale of 10,000 units per year of the electronic management device. They derived that projection, they informed him, on the basis of the current sales by All State of other satellite equipment through its distributors and their expectations from national satellite shows. It was also explained that about 200 of the units had already been manufactured at the Kimberling City plant and that the Phenix corporation had some excess inventory of materials. McGuire testified as to an agreement between Phenix and All State whereby All State could purchase the Phenix I only through the Phenix corporation: "Phenix was to manufacture the device. All State was to be the distributor and to sell the produce [sic] through its dealer system." Aldrich testified that he had no knowledge of such an agreement, and there was no evidence that the agreement—if subsistent—was ever disclosed to Harmon at that negotiation or thereafter.[3]

These principals met again on October 18, 1983 at the Harmon site in Grain Valley, except that commission man Schmitz was not there, and Randy John was. The tender by Harmon to produce the units at a cost of $24 for labor only and $105.29 for labor and material was accepted by McGuire and Noel. The quotations were based on the manufacture of 10,000 units and—according to Aldrich—McGuire and Noel understood that the agreement was to quantity as well as to price. The satellite dish industry was then volatile because—as McGuire explained—the legality of the private use of that device was uncertain, and so they urged delivery as soon as possible. Thus, contemporaneously with the agreement to purchase 10,000 units at the quoted prices, McGuire and Noel gave a verbal

purchase order for 500 units and ascribed number 1585 to that transaction. The next day Harmon commenced to hire and train personnel to meet those production needs. The first order was for labor only, and Robinson and Noel delivered to Harmon materials sufficient to produce about 950 units. [In the words of McGuire: "So we brought all the stuff up."] Harmon was also provided sufficient cartons to package those units. Harmon commenced delivery on November 23, 1983 on purchase order 1585 and was always paid by Phenix check. The production of the 500 units under the verbal order was completed at the end of December 1983 and Harmon Industries— through Aldrich immediately requested a written purchase order for the balance of the 10,000 units. Noel repeatedly promised that a new, written purchase order would be forthcoming, and Harmon agreed to continue to produce the units during that interim at his urging. Finally, during the last of January, 1984 Harmon received written purchase order number 2589 from Noel, but for 1,000 units only. Harmon promptly rejected the purchase order because it was not for the balance of the 10,000 units. Harmon was also concerned because about 1,000 units had already been produced and delivered so that the materials supplied by Robinson and Noel were depleted and Harmon commenced to stock material for the purchase orders anticipated under the agreement. In fact, as requested by McGuire and Noel, Harmon had assumed contracts their principals had made with suppliers for the balance of the 10,000 units.

Noel again promised Aldrich to send a new, written purchase order for the balance of the 10,000 units, but it never came. Finally, Aldrich arranged to visit Noel in Kimberling City on March 28, 1984 for that purpose. That was his first glimpse of that facility. McGuire was then in the hospital, and Noel conducted him through the plant. It was then that Aldrich discov-

---

**3.** The facility at Kimberling City—the later evidence explained—housed both the Phenix and All State operations. The personnel of both were interspersed, they used the same telephones, and occasionally facilitated the work of the other. The fiscal officer for All State maintained the ledgers, books and payrolls for Phenix, and the two corporations used the same identification number for state sales tax purposes.

ered that the Phenix and All State operations were conducted in the same building, that their personnel were intermingled and that they used the same telephone facility with the same number. Noel presented Aldrich to Howard Henning as the person "in charge in Jimmy's [McGuire's] absence." Henning was the brother-in-law of McGuire. Noel also presented to Aldrich one LeAnn Krause as the purchasing agent. He did not say for which corporation she worked, but the evidence established that both Henning and Krause were employees of All State—he as manager and she as purchasing agent.

Aldrich discussed with Henning the subject of a purchase order. Henning left for some minutes and returned with the response: "Instead of a purchase order my lawyers are informing me that I should give you a letter of intent." Aldrich rejected the notion of a letter of intent [which he understood was an offer to do business] since Harmon was already in the production of the units, and responded: "What I want from you is a purchase order to cover the balance of the units." Harmon had by then already produced, delivered, and received payment for 1,190 units, so the demand was for a purchase order for 8,810 units from a designated purchaser—whether "Allstate or Phenix or anybody." Henning then went over to the desk occupied by LeAnn Krause and stood over her while she typed a purchase order for 8,810 units on a sheet of blank paper devoid of letterhead. Aldrich rejected the form since, as he explained, "[w]e had so many names at this point I wanted to know who I was doing business with." Aldrich returned the sheet to Henning, who in turn gave it to LeAnn Krause, and the sheet reappeared with the heading: "Allstate Building Systems." The purchase order was assigned the number 840328–01 and was signed by LeAnn Krause "per Charlie Noel." The "per" designation, Krause explained, indicated that Noel was the source of the information shown on the purchase order.

Harmon resumed production under the March 28, 1984 purchase order No. 840328–01 and shipped 95 units to All State that month. Production was interrupted for several weeks by a fire at the premises of a supplier. When production resumed, however, Noel instructed Aldrich to defer shipments for a few weeks because orders for the unit had dwindled. Harmon became restive when the orders did not resume thereafter because 600 units were ready to ship. Aldrich arranged through Noel to consult with McGuire at Kimberling City. He arrived in June of 1984 accompanied by Harmon credit manager Brockmeier and Harmon vice president of operations Lemieux. They met with McGuire, Noel and Epsey, the All State comptroller. McGuire and Noel informed them that their salespeople were at an industry show in New York and that the prospect for sales was good. They negotiated with McGuire and Epsey a carrying charge of 14% to offset the cost to Harmon to maintain inventory. They requested also a chart of the corporate structure, but never received one.

The next week Aldrich called Noel, but the shipment of units was still on hold. In August of 1984 Noel released 69 units and then 60 units, but All State refused to accept or pay for any more. In July of 1984 [before the release of the units in August] Harmon credit manager Brockmeier made a demand on McGuire for the payment of the balance open on All State purchase order number 840328–01. McGuire responded that the purchase order was "a clerical error," that "[t]he letter was supposed to be issued by Phenix, not All State," but that secretary Krause simply "used the wrong company header." It was the McGuire testimony that although at the time of the transaction Henning bore the title of All State manager—as did McGuire himself—Henning lacked authority to empower such a contract.

Harmon made attempts to mitigate its damages by the return of unused materials and the quest for alternative buyers but had limited success since the parts were unique and some already obsolete. Harmon presented evidence that the breach by All State of the purchase order entailed a loss to the corporation from the profits expected from the manufacture of the units under purchase order 840328–01,

from the raw materials purchased for that manufacture, from the value of the units already finished, among other sources of damage. Harmon dismissed its cause of action against Phenix Ventures at the close of all the evidence and submitted against All State Building Systems only.

## I
### The Motion to Dismiss

In the midst of trial Harmon brought to the notice of the court certificates from the Secretary of State of Missouri that the corporate charters of the defendant corporations had been forfeited. These records certified that the charter of All State Building Systems, Inc. was forfeited on October 24, 1985 for failure to maintain a registered agent and office in the State of Missouri, and that the charter of Phenix Ventures Limited was forfeited on January 1, 1985 for failure to file the annual registration report for year 1984. The action by Harmon against the corporate defendants was commenced on September 24, 1984. Thus the suit pended at the time of each of the forfeitures. The trial of the action commenced on November 18, 1985, thus each of the forfeitures was entered by the Secretary of State prior to the commencement of the trial. The forfeitures remained unrescinded at the time of trial.

The certificates of forfeiture apparently posed a quandary of procedure to the litigants as well as to the court. The corporate defendants, All State Systems and Phenix Ventures, moved to dismiss the Harmon petition on the premise that the failure by Harmon to amend the petition to substitute as parties defendant the directors and officers of the defunct corporations as statutory trustees with the power to be sued under § 351.525, RSMo 1978 caused the corporations "the burden and expense" of a useless defense of claim. There was no intimation of explanation by either All State or Phenix, however, as to how the forfeiture of charter—and hence cancellation of the very corporate existence—could have gone unnoticed. The motion to dismiss was eventually denied. Harmon then proposed that the principals

stipulate that the statutory trustees of each corporation [presumably as defined and empowered in § 351.525] be substituted as the parties defendant in the suit—and All State and Phenix concurred "for the purpose of submitting this case to the jury." Harmon insisted, rather, that the stipulation extend also to an eventual appeal—and serve to "waive any right at time of appeal to complain as a defect about the substitution of parties, or that the correct parties were not in the lawsuit." The corporate defendants demurred and reiterated that their stipulation was prompted by the purpose "of getting something submitted to the jury in this case so we haven't wasted three days of trial over this issue that plaintiff's counsel had notice of prior to trial." The court made plain that the leave to amend the pleading to substitute the trustees in lieu of the corporations would be withheld unless the stipulation of the litigants encompassed the waiver of any claim of defect of parties on the appeal. The corporate defendants acquiesced and the court allowed the stipulation to substitute parties defendant.

The trial thereupon resumed, the evidence concluded, Harmon dismissed Phenix from the petition, submitted the cause of action against All State and had a verdict. All State appealed. In due course, and after the appeal was fully briefed, Harmon moved to dismiss the appeal on the ground that All State was a defunct corporation and so without capacity to appeal. Harmon cites the effect of § 351.535. That statute constitutes the officers and directors of the corporation in dissolution as the trustees of the corporate affairs and invests them exclusively with the capacity to litigate or to treat with the corporate affairs. *Clark Estate Co. v. Gentry*, 362 Mo. 80, 240 S.W.2d 124, 128 (1951). It operates as the mechanism whereby litigation may continue against a corporation in dissolution and, to that purpose, renders the trustees—as its legal representatives—necessary parties to the suit. *Bruun v. Katz Drug Co.*, 351 Mo. 731, 173 S.W.2d 906, 910[10, 11] (1943). To prevent abatement of the action the statute contemplates

a substitution in the litigation of the legal representatives for the corporation in dissolution. 173 S.W.2d at 910.

■ The premise of the motion to dismiss is that, although the All State charter remained in forfeiture, the appeal was brought by All State and not in the name of the statutory trustees. That argument misconceives the function of substitution as to a corporate defendant whose charter is forfeited during the litigation. It does not operate on principles of "waiver" as the litigants and the trial court supposed, but of necessary party. It implements the desideratum of § 351.525 that the statutory trustees act as the legal representatives of the defunct corporation to subserve the interests of the real parties in interest in the litigation—the creditors and stockholders of the corporation in dissolution. *Bruun v. Katz Drug Co.*, 173 S.W.2d at 910; *State ex rel. McDowell v. Libby*, 238 Mo. App. 36, 175 S.W.2d 171, 174[5] (1943); *Clark Estate Co. v. Gentry*, 240 S.W.2d at 130. Nor need the order of a court to substitute for the corporate defendant in such circumstances abide the agreement or stipulation of the parties. The procedure is more elementary. The statutory trustees succeed to the interest of the corporation by operation of law under § 351.525, and the notice of forfeiture—by a display of the certificate of that official action—suffices for the order of substitution:

Rule 52.13. *Substitution of Parties*
. . . .

(e) *Dissolution of Corporation*

When a corporation has been sued and served with a process or has appeared while in being, and is thereafter dissolved or its charter forfeited, the action shall not be affected thereby and *any judgment obtained shall have the effect of a judgment against the directors and officers in office when any such dissolution or forfeiture occurs, in their representative capacity, although they were not joined in the action.* [emphasis added]

■ It is explicit in Substitution of Parties Rule 52.13(e), therefore, that any judgment against a corporation in being at the commencement of suit but become defunct, is only nominal, and has the effect of a judgment against the statutory trustees—*although they were not joined in the action.* So it is on appeal. Where at the commencement of appeal the party is a corporation in being but during its pendency the charter of the corporation is forfeited, the substitution of the statutory trustees serves to continue the litigation to judgment—*without formal joinder of the substituted parties or "change [in] the style of the case." Macklind Inv. Co. v. Ferry*, 341 Mo. 493, 108 S.W.2d 21, 22[1] (1937). There is, of course, no impediment to the redesignation of the parties upon order of substitution, and Harmon may even insist upon that formality [Rule 52.-01]. But it is the substitution of those persons the statute constitutes the legal representatives of the defunct corporation which prevents the abatement of the action, and not any formal designation "in the style of the case." *Macklind Inv. Co. v. Ferry*, 106 S.W.2d at 22; *Bruun v. Katz Drug Co.*, 173 S.W.2d at 910[10, 11]; *Nudelman v. Thimbles*, 225 Mo.App. 553, 40 S.W.2d 475, 477[3–5] (1931); Rule 52.13(e). The trial court order to substitute the statutory trustees as parties defendant in lieu of All State Building Systems, Inc.—although not by formal redesignation—was validly accomplished. It is evident that the litigants—Harmon, All State and Phenix—understood and contemplated at the time of the "stipulation" that an appeal would eventuate, and agreed that the continued validity of the substitution order would not be questioned. The appeal, in any event, is but an incident of the litigation, and the trial court order of substitution retains its efficacy on the appeal, no less than at the trial, until the entry of final judgment.

The motion by Harmon to dismiss the appeal of the statutory trustees *sub nomine* All State is denied.

## II

### Sufficiency of the Evidence

All State argues that the Harmon claim was not proven, and hence the denial of its

motion for directed verdict was error. The theory of the case was the existence of a consummated contract between All State and Harmon and its breach by All State to the damage of Harmon. That theory of recovery was given to the jury by Instruction No. 4:

Your verdict must be for the plaintiff and against defendant All State Building Systems, Inc. if you believe:

First, plaintiff and defendant entered into an agreement whereby plaintiff agreed to manufacture, sell and deliver to defendant a total of 8,810 Phenix One satellite antenna controls and defendant agreed to pay for the satellite antenna controls at a cost of $106.29 per unit[4] for a total amount of $936,414.90, at a rate of 125 units per week for the first two weeks, then 250 units per week for the next 34 weeks, and 60 units for the last week, and

Second, plaintiff would have been prepared to perform all material conditions of it by the date the contract should have been completed but for defendant's announcement that it refused to perform the contract, and

Third, defendant failed to perform its agreement, and

Fourth, plaintiff was thereby damaged.

All State contends nevertheless that there was no substantial evidence that either All State or Harmon intended to contract on the subject matter—or that if a contract was actually formed, that Harmon was prepared to perform its terms—or if prepared to perform its terms, that Harmon was damaged by the All State nonperformance.

The contract Instruction No. 4 submits is in the terms of purchase order No. 840328–01 subscribed by All State purchasing agent LeAnn Krause per Charlie Noel, and issued to Harmon production manager Ald-

rich on March 28, 1984. The text of that writing is:

NO. 840328–01

ALL STATE BUILDING SYSTEMS
Tara Office Park
Kimberling City, MO 65686
March 28, 1984
S.A.B. Harmon Industries
P.O. Box # 600
Grand Vally [sic], MO 64029

Please send to the above address at a rate of: 125 Units per week for the first two weeks; then 250 Units per week for the next 34 weeks; finally 60 Units the last week, for a total of 8810 Units at a cost of $106.29 per Unit of the Phenix One satellite antenna control, Units as described to your Ted Aldridge by our Charlie Noel.

The total amount for this order is then $936,414.90 payable upon receipt for each weekly shipment.

Thank you,
/s/ Leann Krause
Purchasing Agent
per Charlie Noel

To sustain the argument that there was no evidence of intention that purchase order No. 840328–01 result in contract between All State and Harmon, All State recapitulates incidences of *previous transactions* among the actors—Aldrich, McGuire, Noel and their corporate principals, Harmon, Phenix and All State—to demonstrate that all the previous orders for the electronic component by Harmon were always from Phenix and paid by Phenix, and that it was known to Aldrich [and hence to Harmon] that Phenix, and not All State was in the business of the manufacture of Phenix I, and hence—whatever the verbal trappings of the March 28, 1984 purchase order—All State could not have been the intended purchaser. All State argues also the effect of the evidence that All State managed "the administrative pa-

---

**4.** In the course of dealing between Harmon and McGuire, Noel, Phenix Ventures and All State, variously, the purchasers provided cartons as well as materials for the first 950 units. Thereafter, Harmon not only provided the materials—by the assumption of the contracts for materials the purchasers had entered into with suppliers—but also furnished the cartons. The cartons cost $1.00 each. The original quotation of $105.29 for labor and materials per unit was thereafter increased by full consensus to $106.29 per unit to reflect the additional $1.00 per unit cost of production.

per work for Phenix Ventures"—and hence "[t]he inference that the March 28 purchase order was produced and signed by All State employees for All State is no more reasonable than the inference that it was signed by them for Phenix Ventures Limited."

To sustain the argument that intention lacked to contract, All State also cites the circumstances *contemporaneous with the March 28, 1984 event*—that Howard Henning, albeit invested as manager at All State in that interim McGuire was absent from illness, was without authority to bind All State to the purchase order, and that neither LeAnn Krause, signatory for All State ["per Charlie Noel"] on the purchase order, nor Noel "knew of the addition of All State's name to the order."

To sustain the argument that there was no evidence of intention to contract, All State recapitulates as well the incidences of performance among the actors *since March 28, 1984.* All State cites the evidence that even thereafter the finished units were picked up at the Harmon plant by the same Phenix man as before and as before paid by Phenix checks; that Harmon sent its demand letter—after the contention of breach of the purchase agreement—to McGuire at Phenix and not to All State.

■ These arguments are not only tendentious, but also confound the standard of review for the direction of verdict for want of submissibility. A direction of verdict cannot issue unless reasonable minds, the evidence considered in the light most favorable to the plaintiff, could only find in favor of the defendant. *Missouri Farmers Association, Inc. v. Barry,* 710 S.W.2d 923, 925 (Mo.App.1986). These arguments are tendentious because they insistently consider the evidence in the light most favorable to the defendant and slight the verdict of the jury. These arguments moreover confound the standard of judicial review with the jury function: It is not a question whether—as All State poses—"[t]he inference that the March 28 purchase order was produced and signed by All State employees for All State [was] no more reasonable

than the inference that it was signed by them for Phenix Ventures Limited." It is a question whether, the evidence considered most favorably to Harmon, reasonable minds nevertheless could find only in favor of All State.

These arguments by All State neglect altogether the evidence which countervails its contentions. There were proofs which allowed the inferences, among others favorable to the verdict: that McGuire never told Aldrich or any other Harmon agent [nor did they otherwise know] that All State was merely the distributor of Phenix products and so had no reason to purchase the Harmon components for the Phenix device; that LeAnn Krause, the actual signatory to the purchase order, was the purchasing agent of All State and its employee exclusively; that Noel who attended that transaction with Aldrich was a management employee of All State [as well as of Phenix] and executed purchase orders; that McGuire as All State manager was empowered to execute purchase orders and Henning was manager in his stead when he approved the purchase order on March 28, 1984; that Noel discussed the purchase order with Henning before it issued and it was made up by Krause with the All State rubric under the supervision of Henning. The essential All State argument that, whatever its formulated terms, the March 28, 1984 purchase order was intended as a contract with Phenix, and not with All State, is compromised by the McGuire testimony that the purchase order was a mistaken transaction as a contract as to *both* Phenix and All State.

■ These arguments by All State, in any event, cannot avail on basic legal principles of contract construction. All State does not contend that the written purchase order as formulated lacked any essential term or was ambiguous, but only that Harmon was mistakenly led to believe that "All State was a party to a contract that All State never intended to enter." A court will not resort to parol or extrinsic evidence to discern the intention of the contractors where the terms of the undertaking are clear and unambiguous. In such a case,

the intention is discerned from the words as written and normally understood. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264[1–9] (Mo. banc 1973).

■ The purchase order was a contract for the sale of goods, and so was governed by Article 2 of the Uniform Commercial Code. §§ 400.2–102 and 400.2–105, RSMo 1986. The Code does not displace the parole evidence rule, but modifies the rigor of that common law principle as to sales contracts. Thus, § 400.2–202(a) renders admissible course of dealing or course of performance to explain or supplement, but not to contradict the writing. *McDown v. Wilson*, 426 S.W.2d 112, 117[1] (Mo.App. 1968); UCC comment 2 to § 400.202(a). A *course of dealing* relates to a sequence of regular conduct between the principals prior to the formation of the present contract. § 400.1–205, UCC comment 2. A *course of performance* relates to the conduct of the principals to the contract subsequent to its formation. § 400.2–208, UCC comment 1; *School District v. Transamerica Insurance Co.*, 633 S.W.2d 238, 247[10, 11] (Mo. App.1982). The precondition for the admission of evidence of *course of dealing*, therefore, is an agreement already made and subsistent. "Before evidence as to the course of dealing is admissible, there must be evidence that there was in fact an agreement which is to be interpreted in the light of such course of dealing. *A course of dealing only gives meaning to or supplements an existing agreement but cannot be relied upon as constituting the agreement of the parties.*" 1 R. Anderson, Uniform Commercial Code § 1–205:30 (3d ed. 1981). A course of performance relates to the way the principals have acted *in performance of the particular contract.* Thus, "[t]he judicial inquiry on this point is limited to the way the parties have acted in carrying out the particular contract that is in controversy, *as distinguished from a general pattern of dealing that may embrace many other contracts or transactions between the parties.*" [emphasis added] *Id.* § 1–205:27.

■ Thus, the evidence All State argues to prove the right to a directed verdict—the mode of the antecedent purchase order transactions between Harmon and Phenix and that continued mode as the performance under the present purchase order, that is, course of dealing and course of performance—even if amenable to the conclusive inference All State attributes to that evidence [that Harmon intended to contract with Phenix and not with All State]—would not be competent as proof of a contract other than the express writing constitutes. A course of dealing yields to an express term of contract which is contrary. § 400.1–205(4).

■ The true and recurrent tenor of the All State evidence and argument, rather, is that All State became a party to the contract by misadventure—that "the clerical error" of the insertion of the All State name atop the purchase order led Harmon "to mistakenly believe that the defendant All State was a party to a contract that All State never intended to enter." That was the tenor of the McGuire conduct as well when he learned of the purchase order upon return from the hospital in August of 1984. He also termed purchase order No. 840328–01 "a clerical error," a letter of obligation which "was supposed to be issued by Phenix, not All State." It was not the burden of Harmon to prove that the purchase order was free from mistake, however. Mistake is an affirmative defense and the burden rests on the party who asserts the defense to prove it. *Stringer v. Reed*, 544 S.W.2d 69, 73[3–6] (Mo.App.1976); Rule 55.08. It was an avoidance of the contention of claim neither pleaded, nor submitted, nor even systematically articulated in argument. The reprise of evidence All State asserts as conclusive proof that the Harmon cause of action was not submissible, therefore, rests on evidence incompetent for that purpose.

■ All State argues further that the refusal to direct a verdict was error because the evidence does not show that Harmon was ready and willing to perform the terms of the March 28, 1984 purchase order and, moreover, failed to prove any

damage from the alleged breach by All State. These arguments are without any merit. There was evidence that three deliveries were made in fulfillment of the purchase order. There was indeed a lapse due to a fire at the plant of a supplier, but All State did not protest that delay, and in fact accepted additional deliveries after that supply resumed. If a strict compliance with the delivery schedule of units described in the purchase order was intended by its terms, All State waived any such requirement. The contention that to the extent there was evidence of damage, it all accrued to Harmon from the transactions with Phenix, and not All State, is fully refuted by the testimony of Aldrich, John and Lemeiux. They gave testimony that the consummation of the March 28, 1984 purchase order with All State prompted the employment of personnel to manufacture the more than 8,000 units that contract specified, and that they suffered specified loss of profits from the All State refusal to perform—among other incidents of damage.

■ The final ground All State asserts as error in the denial of its motion for directed verdict is that the evidence was conclusive that Harmon had already contracted with Phenix for the same production the later March 28, 1984 purchase order prescribed and hence "precluded the creation of [that] later contract with All State." That point—whatever it means to present—was not a component of the formal motion for directed verdict or of the motion for new trial, and hence was not preserved for our review.

The point—as the exposition manifests—is in any event no more than an oblique reversion to the notion that the March 28, 1984 purchase order was a mistaken transaction. All State argues that the course of dealing between Harmon and Phenix antecedent to the March 28, 1984 transaction proved an intention between them to contract for the full 10,000 units, and that Harmon substantially performed under those terms. All State argues, cognately, that there was no evidence Harmon sought an agreement from All State as the guar-

antor of that "course of dealing" with Phenix—and [implicitly] since the All State rubric on the March 28, 1984 purchase order was in any event a "clerical error," there was only one legally subsistent contract for the manufacture of all the 10,000 units—and that was with Phenix.

■ The argument once again unduly neglects the verdict and unduly favors the expositor. The argument once again also abrades the principle that evidence of a *course of dealing* may explain or supplement a commercial sales contract already in existence, but may not serve to contradict such a contract or to stand in lieu of the contract the writing constitutes. §§ 400.2-202(a) and 400.1-205; Anderson, Uniform Commercial Code § 1-205:30 (3d ed. 1982). The issue of mistake was open to All State, but as an affirmative pleading, proven and submitted. All State may not raise an issue on appeal never tendered on the trial. The written terms of the March 28, 1984 purchase order and the course of performance by Harmon under those terms, rather, constituted substantial evidence that the transaction was a consummated agreement between Harmon and All State as contractors.

### III
#### Excessiveness of the Verdict

All State argues that the damages were based on inadmissible summary charts, and hence that element of the cause of action was not proven by competent evidence—but if proven, the damages were excessive.

■ The delineation of the damages came in through the testimony of Randall John, Harmon general manager. His testimony was aided by Exhibits 45 and 46. The former exhibit was a visual chart to assist the jury to understand the details of the John testimony, and the latter was a summary of the damage figures attached to the computer printouts of the individual entries. John established that the printouts were prepared in the ordinary course of business at or near the time of the events described and were maintained by the custodian under the direct control and

supervision of John. All State argues that the printouts were themselves merely summaries of other original documents—such as buy cards for materials and purchase orders—and so, absent the production of the underlying documents, the computer sheets were not the best evidence. The Uniform Business Records as Evidence Act, § 490.680, RSMo 1986, imposes no particular form to qualify a record for admission as evidence. It contemplates, rather, that the record tendered for admission be of the kind entered systematically by the method employed for that purpose by the business. Thus, where the business regularly employs electronic computer equipment to enter and store its business records, printouts of the records are admissible as evidence under § 490.680 if, as the Act requires, the entries they reflect are made in the regular course of business at or reasonably near the time of the occurrence of the events they record—and the trial court is satisfied that the sources of information and mode and time of preparation indicate trustworthiness, and hence justify admission. *Missouri Valley Walnut Co. v. Snider*, 569 S.W.2d 324, 328[1–4] (Mo.App.1978). The evidence of damages was properly admitted.

 The related contention, that there was no substantial evidence to support the award of $291,785.15 is also without merit. John delineated these components of damage, among others: $220,978.56 for raw materials Harmon became obligated to suppliers in contemplation of the production and sale to All State of some 8,000 units under the March 28, 1984 purchase order; $42,179.40 for 428 units produced under the order but not paid for by All State; and $66,463 as lost profits. All State does not dispute the verity of these calculations, but argues rather that the preponderant amount, some $220,000, was pre-existent obligations of Harmon by virtue of the prior transactions with Phenix, and hence the verdict should not stand. There was indeed evidence that at the outset Phenix determined to manufacture the device for itself and, to that end, contracted with suppliers for the materials. When Phenix found that no longer feasible, Harmon commenced to produce the device under the oral purchase order pending a written agreement for the manufacture—and Phenix delivered to Harmon the materials on hand. Then, as the orders increased, first by oral commitments and then by the written purchase order from All State, to ensure supply, Harmon assumed the Phenix contracts for materials. It was the tenor of the evidence [and the jury could have found] that Harmon assumed these undertakings as the purchase orders engendered the need. The argument All State propounds rests on the barest allusions to the record evidence which, in turn, does not sustain contention.

## IV

### Agency

All State argues next that whether the purchase order of March 28, 1984 was concluded by a person with authority to bind All State to the contract was an issue in serious dispute—and hence, the neglect of the verdict director to require the jury to find that the contract was entered by a person acting within the scope of employment or agency was error. All State does not contend that verdict director Instruction No. 4, which submitted the breach of contract theory of recovery, does not otherwise conform to the requirements of MAI.

The evidence presents two episodes of transactions to consummate the manufacture and sale by Harmon of the 10,000 electronic control components at the prices quoted: the manufacture and sale of the devices (1) under the sequence of oral purchase orders from Phenix and (2) under the written purchase order of March 28, 1984 by All State for the balance of the devices. And, indeed that evidence chronicles a state of ambiguous relationships, ambivalent personnel and intermingled business identity as between Phenix Ventures and All State Systems. It was Noel who made overture to contract with Harmon, in August of 1983. Noel was then both a manager of All State as well as of Phenix. At that first encounter, Aldrich asked Noel whose interest he [and engineer Robinson]

represented, but was told that could not be divulged. McGuire attended the next meeting of 1983—when the quantity and price for the manufacture of the device by Harmon was settled. He was then a manager of All State and sole owner of Phenix—and, perhaps also its president. [The predecessor president of Phenix Ventures, Bevelot, was probably also an employee of All State.] The evidence was in dispute as to whether McGuire then disclosed the interest he represented—Aldrich testified that McGuire remained tacit, but McGuire testified that he was there on behalf of Phenix. It is undisputed, however, that after Harmon was settled upon as the manufacturer at the agreed price for the agreed quantity, that the purchase orders at outset were oral and the terms for delivery were cash. In the interim of those cash on delivery sales, in response to a request for a sales tax number of the purchaser, Harmon received first that of All State and then that of Phenix—and the number was identical.

The Harmon disquiet that no written purchase order for the full order of the 10,000 units was yet forthcoming, prompted the visit to the Kimberling City plant where Aldrich and the others observed and learned for the first time that Phenix and All State conducted operations in the same building, used the same telephone system, and intermixed their personnel. It was the Harmon evidence that the repeated requests, not only for "an organizational chart" of the Phenix employees, but also for a written purchase order for the balance of the units which defined the purchaser and consignee were never heeded. Thus, at Kimberling City Aldrich demanded a written purchase order from Noel for the balance of the 10,000 units still unproduced, and was conducted to Henning who was then in charge as manager of All State in lieu of McGuire, absent because of illness. The document was composed by Krause at the direction of Henning—at first without any description of the purchaser—but when refused by Aldrich because of that lack, was completed with the rubric: "ALL STATE BUILDING SYSTEMS."

There was other evidence of ambiguous conduct—as when McGuire [who disclaimed that he ever acted for All State in these transactions] negotiated with Harmon for the 14% carrying charge on the units already manufactured under the March 28, 1984 purchase order with *All State*. Whatever the ambiguity in the role of any actor or principal in the manufacture and sale of the devices under the oral purchase orders, the subject of suit is the written purchase order of March 28, 1984, an agreement between Harmon and All State in terms clear and unambiguous.

■ All State argues that whether the purchase order was concluded by a person with authority to bind All State to the contract was a fact in dispute and hence the neglect of the verdict director to submit that issue was error. Where the recovery of the plaintiff depends upon the agency of an employee of the defendant and the pleading of the defendant denies that the employee acted with authority, the agency of the employee becomes a dispute of fact which the verdict director of the plaintiff must define and submit. *Peak v. W.T. Grant Company*, 409 S.W.2d 58, 60[1] (Mo. banc 1966). In such circumstances, a verdict director which assumes agency is erroneous. *Dickey v. Nations*, 479 S.W.2d 208, 211[3–5] (Mo.App.1972). Cognately, where the pleading of the defendant does not dispute that the employee acted with authority, or where the issue, although formed, the evidence of agency nevertheless stands unrefuted, the hypothesis of agency need not be submitted in the verdict director of the plaintiff. *Bowers v. S–H–S Motor Sales Co.*, 481 S.W.2d 584, 588[2] (Mo.App. 1972); *Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, 111[4, 5] (Mo. 1973); *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249, 255[15] (Mo.App.1975).

■ The Harmon verdict director submitted the theory of recovery that All State breached the March 28, 1984 purchase order. The evidence stands unrefuted that Henning directed Krause to compose the document, and that Krause then subscribed the document as *Purchasing Agent, per*

*Charlie Noel.* It was the verified response to interrogatory by All State that at the time of the purchase order Hennings was a manager of the corporation. It was the uncontradicted testimony that Krause was presented as a purchasing agent and in fact was employed by All State as purchasing agent. Charlie Noel was a manager of All State as well as of Phenix. All State argues the evidence [given by McGuire] that although Henning functioned as manager in his stead during his illness, and although McGuire had the power to contract as manager of All State, Henning did not. The law deems, however, that the apparent—if not the actual—authority of Henning to persons who dealt with him in good faith during that interim to be " 'at least equal to the scope of the duties ordinarily conferred upon other agents of similar character.' " *Ratterree v. General Motors Corporation,* 460 S.W.2d 309, 313 n. 1 (Mo.App.1970).

■ The agency of Henning to conclude the purchase order on behalf of All State, or of Noel for that matter, simply was not an issue. It is the pleadings which formulate whether a fact [here, agency] essential to the recovery the petition alleges is in controversy. *Chandler v. New Moon Homes, Inc.,* 418 S.W.2d 130, 136 (Mo. banc 1967). It is apparent from the cause of action as pleaded that the recovery against All State presupposed a subsistent contract with Harmon validly concluded by persons with authority to contract on behalf of All State. The answer of the defendant All State indeed controverts that the contract was authorized, but only because LeAnn Krause was not authorized: "Defendant ABS [All State Building Systems] further states that LEANN KRAUSE had no authority to bind Defendant ABS to any contract with Plaintiff." It was uncontroverted, however, that Krause was an employee of All State with the authority to execute purchase orders—an authority she had exercised in the past. It is not error to submit agency as a component of the cause of action submitted by the verdict director "merely because the existence of that relationship has been denied by pleaded allegation or by oral disclaimer when it is unac-companied by any supporting facts to substantiate the denial." *Bowers v. S–H–S Motor Sales Corporation,* 481 S.W.2d at 589.

The other ground All State asserts to impugn the validity of verdict director Instruction No. 4 is also without merit. That submission directed that the "verdict must be for the plaintiff and against defendant All State Building Systems, Inc." if the jury found the propositions First, Second, Third. It is the contention that those propositions confounded the jury because they were couched in terms of "defendant" instead of "defendant All State Building Systems, Inc." The instruction, the argument goes, "encouraged the jury to disregard the separate corporate entities of former Defendant Phenix and Defendant All State and enabled Plaintiff to recover on a theory it had not plead." The argument is hardly more than fancy. Phenix was no longer in the case and the cause of action was submitted against All State only, without allusion to Phenix. The instruction makes that clear.

## V

### Miscellaneous

■ All State argues that in the course of the trial Harmon "repeatedly pursued a line of questioning and comments that smacked of an 'alter ego' theory of recovery rather than a simple breach of contract theory"—a strategy calculated "to get the jury to disregard both Defendants' separate corporate status." Thus [we assume the argument means] Harmon thereby led the jury to believe that its pre-March 28, 1984 course of dealing with Phenix was tantamount to a course of dealing with All State, and so unduly facilitated the jury to find against All State on the March 28, 1984 contract. The argument is a reversion, even again, to the recurrent theme that the All State name was a mistaken entry on the March 28, 1984 purchase order—presumably because that transaction, as all the others before among these actors, was with Phenix. It is to be recalled that Phenix was not dismissed from the

case until after the evidence was concluded. It was germane to the cause of action as then in litigation that Harmon probe the liability of both defendants for the repudiation of the obligation to perform the purchase order. It was an inevitable concomitant of that proof that the furtiveness of the actors, the refusal to disclose the principal whose interest they represented from one oral purchase order to the next, and the chameleonic ambiguity of their status and function with Phenix and All State should emerge and influence the jury. At the conclusion of this evidence Harmon elected to submit against All State only on a theory both feasible and supported by the evidence. There was no undue exploitation of the evidence nor any palpable disposition to deceive or to prejudice All State.

■ All State argues also, and finally, that it was error for the trial court to deny *Phenix* leave to amend the answer to plead an affirmative defense and to assert a counterclaim against Harmon. *Phenix,* of course, was dismissed from the case before submission. We need not render the ratiocination All State expounds to demonstrate prejudice from the denial of the Phenix trial motion. It is enough to say that a litigant may complain only of error done to itself, and not to some quondam party, absent and so without interest in complaint. *Dubinsky Brothers, Inc. v. Industrial Commission,* 365 S.W.2d 275, 278[3–6] (Mo.App.1963).

The judgment is affirmed.

MANFORD and BERREY, JJ., concur.